IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

| | | |
|---|---|---|
| KENNETH RAY RHODES | § | |
| v. | § | CIVIL ACTION NO. 5:22cv6-RWS-JBB |
| GARRETT SAXTON, ET AL. | § | |

<u>REPORT AND RECOMMENDATION</u>
<u>OF THE UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Kenneth Rhodes, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The case was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and Local Rule CV-72 of the Local Rules of Court for the Eastern District of Texas. The named Defendants are Telford Unit Practice Manager Garrett Saxton, Nurse Manager Rachel Burleson, Nurse Practitioner Tonia McNaughton, and licensed vocational nurse Vera Watson, all of whom are employees of the University of Texas Medical Branch, which provides medical care for prisoners at the Telford Unit.

**I. Background**

Plaintiff states that on or about May 19, 2021, he began experiencing irritation upon urination and noticed that he had blood in his urine. On May 25, 2021, Plaintiff stated that he had a visit scheduled with a medical provider named Jamie Martin on video for the coumadin clinic.[1] He had a temperature of 102 degrees, which he says is sufficient to warrant a 911 call. Nurse Watson was on duty, but she told him to go back to his cubicle and wait until it was time for his

---

[1] Coumadin is an anticoagulant which acts as a blood thinner, thereby reducing the risks of heart attacks or strokes. *See* https://perma.cc/7KYT-J2R2.

1

appointment with Martin. Plaintiff contends that Watson knew his temperature was dangerously high but did nothing.

Plaintiff states that when he finally saw Martin, she asked him about the 102-degree temperature. He told her that he had a urinary tract infection for a week with bleeding in his urine, and she prescribed him antibiotics for ten days; however, at the end of that time, his infection had not cleared up. He told a nurse named Palmer and she took a urine sample, which verified that he had large amounts of blood remaining in his urine. He was scheduled to see McNaughton in 11 days.

With no medication, Plaintiff states that he bled through his urine until he saw McNaughton on July 2, 2021. She told him that no medication would be prescribed and that he should drink water. He asked about the bleeding in his urine and she replied "hopefully it will clear up."

At around 7 or 8 A.M. on July 9, 2021, Plaintiff was up getting his medications at the pill window for a chronic heart and lung condition. He was suffering from breathing complications and chest pains while standing in line. After receiving his medications, Plaintiff states that he turned to leave the pill window, took a couple of steps, and passed out, falling to the ground. Nurse Watson was no more than six or seven feet away doing blood pressure checks, but she did nothing to assist him. Another inmate, Jeremy Valderus, tried to break Plaintiff's fall but could not. Plaintiff states that Valderus is confined to a wheelchair because he is paralyzed from the waist down. He added that Valderus tried to assist him, but Watson "got rude with him to leave plaintiff there." Dkt No. 1, p. 3.  Another inmate named Christopher Dickerson, whom Plaintiff says is also in a wheelchair, tried to assist him, but Watson told him not to as well. Plaintiff says that a medical aide named Ta'wayana Johnson temporarily stopped the pill window to come and assist him.

Plaintiff states that he had appointments to see McNaughton on July 14, July 16, and July 19, but she rescheduled him each time. On July 21, he had another coumadin clinic telemed visit with Martin. She asked him about the infection, and he told her that he still had blood in his urine

and he was afraid to continue taking coumadin because he was concerned about possible uncontrolled internal bleeding. Martin sent a request to the pharmacy for an antibiotic called ciprofloxacin, but this was non-formulary, so it had to be approved which took a few days. After four days of taking this medication, Plaintiff says that he no longer saw blood in his urine.

Plaintiff complains that he had blood in his urine for a total of seventy days and is afraid that he suffered internal damage. He had a back injury prior to his incarceration and aggravated this when he passed out and fell to the ground. He states that he is now taking two different medications, robaxin, and prednisone, for his back.

In his legal claims, Plaintiff asserts that Nurse Watson did nothing when he passed out, which he says was denial and delay of medical treatment. He also complains that Watson did not ask him about his condition or conduct an adequate examination, but instead told inmates trying to help him to leave him alone.

Plaintiff contends that Nurse Practitioner McNaughton refused to treat him on July 2, but instead told him to drink water and said that "hopefully it will clear up." He also complains that she kept rescheduling him even though he was still bleeding and suffering from the infection. He says that McNaughton told him it might just be a bladder infection and that urinary tract infections were "not her specialty," but did not refer him to more qualified medical personnel.

Next, Plaintiff contends that he notified Practice Manager Garrett Saxton of Watson's actions by filing I-60 inmate request forms, but Saxton ignored his complaints. He complained to nurse manager Burleson and she told him that she would investigate, but he never heard anything else. Saxton finally sent him a response saying that it was his right to exhaust all avenues of complaint, but nothing was done. For relief in his original complaint, Plaintiff seeks declaratory and injunctive relief as well as compensatory and punitive damages. He later filed an amended request for relief (Dkt. No. 20) which sought compensatory and punitive damages, a "program suitable for self betterment," a parole recommendation, and release from prison upon completion of the program.

**II. The Defendants' Motion for Summary Judgment**

In their motion for summary judgment, Defendants first assert that they are entitled to sovereign immunity for claims for monetary damages against them in their official capacities. They state that Plaintiff lacks standing for declaratory and injunctive relief because he is no longer at the Telford Unit.

Defendants maintain that Plaintiff's claims against Saxton and Burleson are based upon *respondeat superior*, which is not applicable in § 1983 lawsuits. They argue that to the extent Plaintiff complains of a conspiracy, they cannot conspire with one another because they are all employees of the University of Texas Medical Branch and the employees of UTMB are one single entity that cannot conspire with itself.

Defendants argue that Plaintiff's claims against McNaughton are refuted by the medical records, which show that she noted his symptoms, ordered labs, educated him on medication and the cause of the infection as well as caloric and dietary needs, and scheduled a follow-up visit with a provider when the lab results were returned. Even if McNaughton told him that "hopefully it will clear up," the Defendants assert that this does not rise to the level of deliberate indifference.

With regard to Watson, Defendants state that Plaintiff provided no evidence to show that Watson was aware of a serious medical need or that she saw the alleged fall. They note that Plaintiff says Watson was conducting blood pressure checks and that the medical aide came to his assistance, saying that if Watson knew that he fell but saw that he was receiving treatment from someone else, then she would not be disregarding a risk to his safety.

In addition, Defendants contend that Plaintiff has not shown that he suffered any harm as a result of any alleged delay in medical treatment. They state that X-rays of his back were done which showed no significant injury, but only mild to moderate degenerative changes in the lumbar spine. Defendants argue that Plaintiff's claims amount to no more than disagreement with the Defendants' medical decisions, which do not rise to the level of deliberate indifference. Finally, Defendants invoke their entitlement to qualified immunity.

**III. Plaintiff's Response to the Defendants' Motion**

Plaintiff argues in his response that Watson saw him fall, and then went into the infirmary and closed the door, leaving him on the ground. He says that a medical aid is not a nurse and is not qualified to "spearhead an emergency." Dkt. No. 54 at 4. Plaintiff claims that the medical aid, Johnson, told another inmate to go get a wheelchair but then "recanted her statement due [to] a conspiracy cover-up attempt." He again says that McNaughton was aware that he had been bleeding in his urine for several weeks but her only medical assistance was to tell him to drink some water and hope it cleared up.

Plaintiff argues that his claims for declaratory and injunctive relief are not moot because he is experiencing retaliation at the Pack Unit. He maintains that Saxton and Burleson are involved because he notified them multiple times of the issues taking place but they did nothing. After arguing that Watson violated TDCJ policy, Plaintiff states that the Defendants are not entitled to qualified immunity because he has shown clearly established constitutional and policy violations.

**IV. The Summary Judgment Evidence**

A. Defendants' Evidence

Plaintiff's medical records show that he was seen on a telehealth visit with Nurse Practitioner Jamie Martin on May 25, 2021. He complained of burning and pain with urination for three days, but denied nausea, vomiting, diarrhea, a cough, a runny nose, or a sore throat. He had a temperature of 102 degrees and a pulse of 116. Martin prescribed an antibiotic called Macrobid 100, which apparently cleared up the symptoms temporarily, but they returned on June 16. Dkt. No. 33-1, pp. 3, 12-18.

On June 19, 2021, Plaintiff returned to the clinic and saw a nurse named Shagayla Palmer. He complained of pain with urination but denied any discharge. A urine sample was taken which returned abnormal results and the on-call provider, Nurse Practitioner D.A. Ruby, was notified. Ruby gave an order for an antibiotic called Bactrim. Plaintiff told the nurse that the infection had cleared up for a few weeks but then returned. He was encouraged to drink plenty of water and was

5

released to security. The next day, the Bactrim was discontinued and replaced with Macrobid. Dkt. No. 33-1, pp. 19-27.

On June 23, Plaintiff was seen by Martin at a telehealth visit. She noted that a urine sensitivity report is pending and that the antibiotic would be changed if a change was indicated by the sensitivity report. Dkt. No. 33-1, p. 34. A chart review was done on June 29 and Plaintiff was scheduled to see a provider to determine if the infection had cleared up. Dkt. No. 33-1. P. 37.

Plaintiff saw Nurse Practitioner McNaughton on July 2, 2021. He expressed concern that a medication he was taking called Ambisentan was causing him to have urinary tract infections. He denied fever or chills. McNaughton noted that Plaintiff was only drinking two 16 ounce bottles of water per day and discussed with him that this could be causing some of the infection and possibly cystitis v. prostitis. Plaintiff also had anemia, possibly as a result of a procedure he previously had in the hospital, but was not taking in enough calories to replenish his blood and iron. McNaughton ordered labs and added a dietary supplement called Glucerna, and educated him on medication, causes of urinary tract infections, caloric intake and dietary needs, and the signs and symptoms to report to the nursing staff. She stated that a follow-up would be scheduled with a provider when the lab results were in the electronic medical records.

The next entry in the medical records was on July 18, 2021, when Plaintiff was seen by Nurse Palmer complaining of urinary problems. He told her that he had passed out at the pill window a week earlier and had not been feeling any better. He has been on two rounds of antibiotics with no relief and has not started on any other medications but was just instructed to drink plenty of water. He grimaced when his lower abdomen was palpated and his urine was thick and dark yellow in color. Dkt. No. 33-1, p. 48.

Plaintiff then saw Martin in a telehealth appointment on July 21. She requested a prescription for a non-formulary antibiotic called ciprofloxacin. Dkt. No. 33-1, pp. 54, 57.

On August 10, 2021, Plaintiff was seen in the clinic complaining of back pain. He told Nurse Palmer that he injured his back years ago but recently fell and re-injured it. He said that he had

"shocking pain" and then tried to stand but it radiated down his right leg with numbness. An examination found that he had full range of motion in all extremities and his neck, he was able to bend forwards and backwards and had full left and right lateral flexion, his gait and movements were normal, his posture was normal, and his peripheral pulses were present without peripheral edema. Dkt. No. 33-1, pp. 62-63.

On August 17, 2023, Plaintiff saw Nurse Watson in the clinic. She noted that he had ambulated to 17 Building medical to be seen on a nursing sick call for back pain. Although he rated his pain as a throbbing 7/10 which increases to 9/10 when he sits or lays in a certain position, his vital signs were within normal limits and he was in pleasant spirits. She noted that he had full range of motion in his extremities and neck, he was able to bend forwards and backwards with full lateral flexion, his movement and gait were normal, his posture was normal and erect and he sits easily, and his peripheral pulses were present with no peripheral edema. Dkt. No. 33-1, pp. 70-71. An X-ray was scheduled and Plaintiff was prescribed prednisone and Robaxin, a muscle relaxer, for his complaints of pain. He was educated on stretching daily and shown exercises and was scheduled to see the provider in a week Dkt. No. 33-1, p. 4.

On August 20, Plaintiff saw Martin on a telehealth appointment and said that he now had no blood in his urine. Dkt. No. 33-1, p. 76. X-rays of his back were taken on August 23, which showed normal lumbar lordosis and sagittal alignment with the vertebral body heights preserved. There were degenerative changes noted in the form of disc space narrowing, anterior osteophytes, and facet arthropathy, which were mild to moderate in severity, but there were no acute osseous findings.[2] Dkt. No. 33-1, pp. 78, 82.

On August 25, 2021, Plaintiff saw McNaughton and complained that he had no improvement with the prescribed medications, and he was referred to the neuro-spine clinic. On August 31, he

---

[1]Osteophytes, commonly referred to as bone spurs, are smooth bony growths which develop over time. Facet arthropathy is the wearing down of the facet joints in the spine, which can be caused by arthritis or simply by aging. "No acute osseous findings" means that there was no finding of a recent injury or abnormality.

7

was seen by Watson, who noted that he did not respond to the prednisone or muscle relaxers. However, he walked without assistance, his joints were normal, he had full range of motion in his left and right upper and lower extremities and his neck, he was able to bend forward and backwards and had full left and right lateral flexion in his back, his movement, gait, and posture were normal, he could sit easily. His peripheral pulses were present with no peripheral edema. Dkt. No. 33-1, p. 88.

An affidavit from Dr. Bobby Vincent states that the fact that a patient has a 102-degree temperature does not necessarily indicate a "911 emergency." After Plaintiff received antibiotics on May 25, his symptoms improved, but then came back around June 16. He was started on Bactrim but this was changed the next day to avoid any possible interactions with a blood thinner called coumadin. Because coumadin is an anticoagulant, it could result in an increased risk of bleeding. Dr. Vincent noted that McNaughton discussed the need to increase Plaintiff's water intake because she believed this could have contributed to the blood in his urine. Dr. Vincent also observed that there is no documentation in the medical records concerning a fall on July 9, 2021, other than mentions by Plaintiff of such an incident. Dkt. No. 33-1, pp. 2-7.

B. Plaintiff's Evidence

The first document submitted by Plaintiff is the second page of a Step One grievance complaining about the July 9 incident with Watson. The grievance complains that Watson did not initiate any medical care or take him to the medical department, nor did she take his vital signs. The response to the grievance says that Plaintiff refused to come to the medical department on July 9 and 11 and that on July 14, he wrote a sick call request about a urinary tract infection. He was seen by medical and his urine was tested. He was seen by a provider on July 21. On August 10, he submitted a sick call request about back pain due to a fall, which was the first notification of the injury. The August 23 X-ray showed no acute fracture or injury. A referral was made to the ortho-spine clinic which is still pending, and he was seen by medical on August 31 and September 3. The grievance response stated that the claims of misconduct could not be substantiated and that he has received access to care. This response was signed by Rachel Burleson. Dkt. No. 54-1, p. 2.

The next exhibit is the second page of a Step Two grievance complaining that Saxton and Burleson did not find any wrongful conduct by McNaughton or Watson, which Plaintiff claimed was an "unwritten policy, pattern, or custom to allow this form of misconduct to continue." The response to this grievance said that the medical staff named did not see him falling but saw him being assisted to his bunk. The LVN whom Plaintiff named - presumably Watson - documented that Plaintiff received his medication from the pill window, turned to walk away with an unsteady gait, stumbled, and fell into the lap of another inmate in a wheelchair. Plaintiff was helped up and said he was okay, walking away with a steady gait. He appeared to be uninjured and did not need assistance. Dkt. No. 54-1, p. 3.

A written statement by Watson, part of a grievance investigation worksheet, states that Plaintiff was getting his medication from the pill window when he turned to walk away and stumbled, falling into the lap of another inmate in a wheelchair. This document has a handwritten notation saying "page 1 of 3." Dkt. No. 54-1, p. 12. What appears to be another page of this document appears at docket no. 54-1, p. 12, consisting of a written statement by Johnson. This statement says that Johnson was passing out medication at the pill window and did not see Plaintiff fall. She did see him being assisted to his bunk and went to check on him ten minutes later. He told her that he was okay.

After furnishing copies of medical policies and procedures, Plaintiff attaches a copy of an I-60 inmate request form saying that he sent a request to the medical department on August 9 complaining about his back pain which began after his fall on July 9. The response says that he was seen in the medical department on August 17. Plaintiff handwrote "17th Watson apologized to me for leaving me on the ground" on one copy of the I-60 form. Dkt. No. 54-1, p. 9.

Plaintiff also attaches his own affidavit concerning his claims. He states that he was originally prescribed medication which did not work, and then McNaughton refused to prescribe

medication for him but instead told him to drink water and hope it cleared up. He says that Watson saw him pass out and fall to the ground but simply left him there to suffer. Saxton and Burleson disregarded the conduct of McNaughton and Watson, but Watson's statement confirmed that the incident occurred. Dkt. No. 54-1, pp. 2-3.

## V. Discussion

A. General Standards for Summary Judgment

Summary judgment is properly granted only when, viewing the evidence in the light most favorable to the non-moving party, the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Ellis v. Garza-Lopez*, slip op. no. 23-10022, 2023 U.S. App. LEXIS 13305, 2023 WL 3723634 (5th Cir., May 30, 2023); *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577, 589 (5th Cir. 2004). If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.* (citing *Allen v. Rapides Parish School Board*, 204 F.3d 619, 621 (5th Cir. 2000)). The plaintiff cannot oppose summary judgment by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated or speculative assertions, or by only a scintilla of evidence. *Boudreaux v. Swift Transportation Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Prison Legal News v. Livingston*, 683 F.3d 201, 211 (5th Cir. 2012).

The court has no obligation to sift the record in search of evidence to support a party's opposition to summary judgment. *Adams v. Traveler's Indemnity Co.*, 465 F.3d 156, 164 (5th Cir. 2008). Instead, a party opposing summary judgment must identify specific evidence in the record which supports the challenged claims and articulate the precise manner in which the evidence supports the challenged claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A properly supported motion for summary judgment should be granted unless the opposing

party produces sufficient evidence to show a genuine factual issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

B. Deliberate Indifference to Serious Medical Needs

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997); *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989). In order to show deliberate indifference, the prisoner must show (1) objective exposure to a substantial risk of serious harm, (2) the defendants had subjective knowledge of this substantial risk, (3) the defendants denied or delayed the prisoner's medical treatment despite their knowledge of this substantial risk, and (4) this denial of or delay in treatment resulted in substantial harm. *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019).

Disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference. *Id.*; *see also Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006), (citing *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) (prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.")

Claims of negligence, medical malpractice, or that the treatment provided has not been as successful as the plaintiff would have liked are insufficient to set forth constitutional violations. *Gobert*, 463 F.3d at 346; *Norton*, 122 F.3d at 291. Likewise, the fact that medical care given is not the best that money can buy, or that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992).

In *Domino v. TDCJ-ID*, 239 F.3d 752 (5th Cir. 2001), a prisoner expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination. The prisoner committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

*Domino*, 239 F.3d at 756; *Stewart v. Murphy*, 174 F.3d 530, 534-38 (5th Cir. 1999) (no deliberate indifference where patient died from bedsores where treatment was provided and orders for care were given, despite evidence that the bedsores were not discovered during the patient's stay in the hospital, the doctors often did not review the nurses' notes or check to see if their orders were carried out, antibiotics were not prescribed although the nurses' notes said that the patient had an infection from a catheter, and the treating physician did not follow a recommendation that the patient be transferred despite knowing that the facility was understaffed).

C. Application of the Standards to the Present Case

1. Nurse Practitioner McNaughton

Plaintiff complains that Nurse Practitioner McNaughton did not prescribe him any medication when she saw him on July 2, but simply told him to drink more water and "hope it would clear up." The medical records show that McNaughton noted that Plaintiff was only drinking two bottles of water per day and told him that this could be causing some of his urinary tract infection.

According to the National Institute for Health, medical professionals routinely recommend that persons with urinary tract infections drink plenty of water - six to eight eight-ounce glasses a day, or 48 to 64 ounces, is recommended. *See* https://perma.cc/YW8M-TN6E.

McNaughton stated that Plaintiff was drinking two 16-ounce bottles of water, or 32 ounces, well below the recommended amount. The fact that she advised Plaintiff to drink more water is consistent with normal medical practice and plainly cannot constitute deliberate indifference to his serious medical needs.

Plaintiff also complains that she did not prescribe him medication at that time. The medical records show that he had been on two rounds of antibiotics but was still suffering symptoms, and McNaughton ordered labs to be done, with a follow-up appointment with a provider once the lab results were in the electronic medical records. The fact that McNaughton chose to wait for lab results rather than prescribing yet another round of antibiotics immediately does not show deliberate indifference to his serious medical needs. Plaintiff's claims against McNaughton are without merit.

2. Nurse Watson

Plaintiff first complains that when he saw McNaughton on July 2, he had a fever of 102 degrees but Nurse Watson did not call 911, instead sending him back to his cell to wait for his appointment. Dr. Vincent stated in his affidavit that a temperature of 102 degrees does not necessarily constitute a "911 emergency." Dkt. No. 33-1, p. 6. Plaintiff has not shown that Nurse Watson's failure to call 911 amounted to deliberate indifference to his serious medical needs.

Plaintiff next complains that on July 9, he fell while leaving the pill window. He says that he passed out and hit the floor, but Watson did not come to his assistance. He quotes Watson as saying that he stumbled and fell into the lap of another inmate in a wheelchair and complains that Johnson "recanted her statement" as part of a cover-up. Dkt. No. 54 at 16.

As noted above, there are no entries in the medical records specifically concerning this incident. The entry for July 18, 2021 notes that Plaintiff reported to the medical department that he was still having urinary problems and that he passed out at the pill window about a week earlier and has not been feeling any better. He described his pain as being in the lower abdomen and relating to urination. He made no mention of any back pain at this appointment, nor when he saw Martin at a telehealth appointment on July 21. Dkt. No. 33-1, pp. 45-47.

13

The first mention of back pain in connection with the fall came on August 10, 2021, a month after the incident. Plaintiff submitted a sick call request saying that he had been having problems with his back ever since he "blacked out at pill call 7-9-21." However, when seen that same day, the nurse observed that he had full range of motion in both arms, both legs, and his neck, he was able to bend forwards and backwards and had full left and right lateral flexion, his gait and movements were normal, his posture was normal, and his peripheral pulses were present without peripheral edema. Dkt. No. 33-1, pp. 62-63. These findings are not consistent with Plaintiff's conclusory complaints of severe pain, and the same findings were made when he was seen on August 17 and again on August 31. *See generally Wilburn v. Shane*, 193 F.3d 517 at *2, 1999 U.S. App. LEXIS 38885, 1999 WL 706141 (5th Cir. 1999), (citing *Wesson v. Oglesby*, 910 F.2d 278, 281-82 (5th Cir. 1990) (noting that "based on the objective factors of Wilburn's medical records, which show no evidence of any injuries consistent with his allegations of excessive force, Wilburn's allegations are implausible")); *Hunt v. Pierson*, 730 F.App'x 210, 213-14 (5th Cir. 2018) (no deliberate indifference where nurse removed inmate's walking cane because she had seen him walking around without using it, despite inmate's claim that he needed it for degenerative disc disease).

Likewise, X-rays taken of Plaintiff's back did not reveal any injuries which could have been caused by the fall. In the absence of any evidence of substantial harm, Plaintiff's claim of deliberate indifference with regard to the incident of his fall in the pill window line is without merit. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993) ("delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm"); *McGiffin v. Clayton*, slip op. no. 08-40213, 2009 U.S. App. LEXIS 4311, 2009 WL 577721, *1 (5th Cir. 2009) (court noted that plaintiff did not allege that the delay in his treatment caused any lasting complications to his medical conditions).

Nor has Plaintiff shown that Watson acted with deliberate indifference in this regard. He says that he fell and Johnson came over to assist him, and the documents he furnishes indicate that he was helped to his feet and assisted to his bunk. Even assuming that Watson watched all this happen, this is not sufficient to show that Watson actually knew of and disregarded an excessive risk

to Plaintiff's health or safety. Johnson's statement says that Plaintiff told her he was okay, which Plaintiff does not refute. Whether or not Watson may have been negligent in her response to Plaintiff's fall, Plaintiff has not demonstrated a constitutional violation. His claims against Nurse Watson are without merit.

3. Practice Manager Garrett Saxton and Nurse Manager Rachel Burleson

Plaintiff contends that Saxton is "head of the medical department" and is "legally responsible for the overall operation" of the medical department at the Telford Unit. He says that Saxton was notified of the violations and malicious actions of Watson, but chose not to do anything. He states that Burleson is the nurse manager and the head of nurses at the Telford Unit. When he sent her an inmate request form, she responded that she would investigate, but nothing came of it.

Plaintiff asserts that Saxton and Burleson were "responsible for the actions of defendant Vera Watson (1) for setting in motion an unwritten policy, custom, and pattern of acts by others, or knowing refusing to terminate or interfere with the acts of defendant Vera Watson which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training or control of defendant Watson; (3) for acquiescence in the constitutional deprivation by defendant Watson; and (4) for conduct that shows a reckless or callous indifference to the rights of others." He complains that Saxton and Burleson failed to remedy the constitutional violations and failed to act on information that unconstitutional acts were occurring. Plaintiff appears to contend that Saxton and Burleson conspired to deprive him of his constitutional rights.

As Dr. Vincent observed, Practice Manager Saxton is not a nurse or a medical provider, but an administrator, and as such plays no role in the provision of medical care or the prescribing of medication. Dkt. No. 33-1, p. 7; *see Parrott v. Sizemore*, slip op. no. 20-40586, 2022 U.S. App. LEXIS 15922 (5th Cir. 2022) (citing *Criollo v. Milton*, 414 F.App'x 719 (5th Cir. 2011) (affirming denial of claim against Practice Manager Pam Pace because as a practice manager, there was no showing she was involved in the prisoner's medical care)); *see also Hunt v. Pierson*, civil action no.

15

6:15cv559, 2016 U.S. Dist. LEXIS 46651 (E.D. Tex. 2016), *report adopted at* 2016 U.S. Dist. LEXIS 45772 (E.D. Tex. 2016), aff'd 730 F.App'x 210 (5th Cir. 2018).

To the extent Plaintiff sues Saxton and Burleson because of what he perceives as their roles as supervisors, his claim likewise fails. Even if Saxton and Burleson did in fact have supervisory authority over Watson and McNaughton, the Fifth Circuit has held that supervisory officials are not vicariously liable under §1983 under any theory of supervisory liability for any actions or omissions by their employees. *Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415, 419 (5th Cir. 2017); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*).

Instead, a supervisor may be held liable if he or she affirmatively participates in the acts causing a constitutional deprivation or implements unconstitutional policies which causally result in the constitutional injury. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). Plaintiff has not alleged any facts showing that Saxton or Burleson affirmatively participated in acts causing a constitutional deprivation or implemented unconstitutional policies or customs resulting in a constitutional injury. *See Spiller v. City of Texas City, Texas Police Department*, 130 F.3d 162, 167 (5th Cir. 1997) (in order to satisfy the cause in fact requirement, the plaintiff must allege that the custom or policy served as the moving force behind the constitutional violation at issue or that his injuries resulted from the execution of the policy or custom; the description of the policy or custom and its relationship to the underlying constitutional violation cannot be conclusory, but must contain specific facts).

Instead, Plaintiff contends that he sent Saxton and Burleson complaints, but nothing was done. The Fifth Circuit has held that prisoners do not have a constitutionally protected liberty interest in having grievances or complaints resolved to their satisfaction. *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005); *Stauffer v. Gearhart*, 741 F.3d 574, 587 (5th Cir. 2014). The mere fact that a prison official received a complaint does not show personal involvement in a constitutional

deprivation. *Whitlock v. Merchant*, civil action no. 5:14cv119, 2015 U.S. Dist. LEXIS 125614, 2015 WL 5909776 (E.D. Tex., September 21, 2015) (mere fact of receipt of grievances does not show personal involvement in a constitutional deprivation) (citing *Cervantes v. Sanders*, civil action no. 2:98cv187, 1998 U.S. Dist. LEXIS 10887, 1998 WL 401628 (N.D. Tex., July 13, 1998) (reading or responding to prisoner's grievance does not show personal involvement by prison official)); *Amir-Sharif v. Valdez*, civil action no. 3:06cv2258, 2007 U.S. Dist. LEXIS 41792, 2007 WL 1791266 (N.D. Tex., June 6, 2007) (failure to take corrective action in response to a grievance does not rise to the level of personal involvement).

Plaintiff does not provide specific facts identifying any allegedly unconstitutional policy or custom implemented by Saxton or Burleson, nor that they were personally involved in any constitutional deprivation. Plaintiff's general and conclusory allegations of a "civil conspiracy" likewise do not set out a valid claim. The Fifth Circuit has stated that plaintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based; bald allegations that a conspiracy existed are not sufficient. *Knatt v. Hospital Service District No. 1 of East Baton Rouge Parish*, 289 F.App'x 22, 33 (5th Cir. 2008) (citing *Lynch v. Cannatella*, 810 F,.2d 1363, 1369-70 (5th Cir. 1987)). Plaintiff wholly failed to set out any operative facts upon which his civil conspiracy claim is based.

In addition, the Defendants correctly assert that Plaintiff's claim is barred by the intra-corporate conspiracy doctrine. That doctrine, as applied to this case, states that the University of Texas Medical Branch and its employees constitute a single legal entity which is incapable of conspiring with itself. *Thornton v. Merchant*, 526 F.App'x 385, 388 (5th Cir. 2013); *Thompson v. City of Galveston*, 979 F.Supp. 504, 511 (S.D. Tex. 1997). Plaintiff's conspiracy claim fails for this reason as well.

Next, Plaintiff alludes to a claim of failure to train. Such a claim requires Plaintiff to show that the supervisor failed to supervise or train the subordinate officer, a causal link exists between the failure to train or supervise and a violation of the plaintiff's rights, and the failure to

train or supervise amounts to deliberate indifference. *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Plaintiff has offered only vague and conclusory assertions concerning a purported failure to train and presented no specific facts on any of the elements of such a claim. As such, his failure to train claim is without merit. *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005).

4. Qualified Immunity

Defendants invoke their entitlement to qualified immunity. In order to overcome qualified immunity, a plaintiff must allege facts showing that the government official violated a constitutional right and that the right was clearly established at the time of the challenged conduct. *Laviage v. Fite*, 47 F.3d 402, 405 (5th Cir. 2022). The Fifth Circuit has explained as follows:

> Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It protects 'all but the plainly incompetent or those who knowingly violate the law.' *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
>
> Our qualified immunity inquiry is two-pronged. *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020). First, we ask whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. Second, we ask whether the right was 'clearly established.' *Id*. We can analyze the prongs in either order or resolve the case on a single prong. *Id.*

*Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2020).

After explaining that a right is "clearly established" only if it is sufficiently clear that every reasonable official would have understood that the defendant's conduct violated that right, and that there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that the conduct is definitively unlawful, the Fifth Circuit went on to state:

> When an official raises qualified immunity on summary judgment, as Sheriff Castloo did here, the plaintiff bears the burden of showing that the defense does not apply. *See Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020). To meet that burden, the plaintiff must present evidence, viewed in her [i.e. the plaintiff's] favor, satisfying both qualified immunity prongs by showing that the defendant (1) violated a constitutional right (2) that was clearly established at the time of the defendant's conduct. *See id*.

*Id.*; *Byrd v. Harrell*, 48 F.4th 343, 346 (5th Cir. 2022) (when an official has asserted qualified immunity, the burden shifts to the plaintiff to rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct). Conclusory allegations are insufficient to overcome the qualified immunity defense. *Williams-Boldware v. Denton County, Texas*, 741 F.3d 635, 643-44 (5th Cir. 2014).

Plaintiff has not shown that any of the Defendants violated any clearly established constitutional right of which a reasonable person would have known. Consequently, he has failed to overcome the Defendants' qualified immunity defense, and his lawsuit may be dismissed on this basis as well.

## RECOMMENDATION

It is accordingly recommended that the Defendants' motion for summary judgment (Dkt. No. 33) be granted and the above-styled civil action dismissed with prejudice.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

SIGNED this the 26th day of January, 2024.

_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE